GRANT J. WHEELER, PLAINTIFF IN ERROR, v. THE ESSEX PUBLIC ROAD BOARD, DEFENDANT IN ERROR.

1. A public corporation cannot be sued for the damages resulting from an act which is *ultra vires*.
2. By force of the constitution of this state, a *public* corporation, exercising lawfully the state's right of eminent domain, is not required, unless the legislature has so ordered, to pay for the land taken, before taking possession of it; *contra*, when so taken by a private corporation.
3. A road board, having the power, widened a public avenue, and in so doing, embraced the mill-dam of the plaintiff; took down such dam, and in lieu of it, built another dam outside of the area of the highway and on land owned by a third party ; such dam so constructed, having given way, the plaintiff was deprived, for some time, of the use of the water in his pond—*held*, that an action for such damage would not lie, as the building of the substituted dam was *ultra vires*.

This case was tried before the Circuit Court of the county of Essex. The facts were as follows :

The plaintiff, since 1865, has been the owner of a mill or manufactory, situate near Tony's brook or First river, a natural stream, in Montclair township, Essex county. For sixty years, the mill had the use of the water of the stream, which was conveyed from the mill-pond, across or under the turnpike, by means of a flume or raceway. The water of the mill-pond, previous to 1872, was collected and retained by means of a rip-rap dam, which extended across the pond, and

was twenty-five or thirty feet in width across, and ten or twelve feet in height.   The dam was strong, well settled, and in good repair.   Below the dam, and at a distance of ten or twelve feet, the bridge of the turnpike crossed the stream. This space was sufficient to accommodate the stream during freshets.   In February, 1872, the Essex public road board took the turnpike by condemnation, pursuant to provisions of act of February 16th, 1870, Sections 1 and 4.  The road board took down the turnpike bridge, widened the whole turnpike from sixty to eighty feet, so that the avenue, as widened, extended to the old dam.

In the construction of the avenue, they took down the old dam and built a new bridge, extending across the whole width of the avenue.   The bridge was of stone, with an arched culvert, and a circular dam, extending out in the pond about        feet, was built into the bridge, the two ends of the circular dam resting on the sides of the arch of the bridge. The top of this dam was three feet six inches below the top of the arch of the bridge.   The opening for the water was insufficient for the stream.   The space with the old dam and bridge was sufficient.

On August 11th, 1875, during a freshet, the dam was carried away, and the plaintiff's mill stopped in consequence for a considerable time.

There was also evidence that the foundations of the dam were defective, being laid, not upon stone or hard-pan, but upon a gravel or mud foundation, and had proper tests been applied, the defective character of the foundation could have been ascertained.

Sheathing of pine or spruce had been driven down behind the dam for one and a half feet *below the foundation of the dam*.   There was also proof that water filtered through the dam and the dry walls of the bridge ever since it was built.

A non-suit was ordered.

For the plaintiff in error, *John R. Emery*.

For the defendant in error, *John W. Taylor*.

The opinion of the court was delivered by

BEASLEY, CHIEF JUSTICE. The defendant in this case is a road board, specially incorporated to lay out or widen certain roads and avenues in the county of Essex, among which was one denominated "Bloomfield." Near to Bloomfield avenue, as it subsisted in its former condition, was a dam over a stream, which operated to keep the water in a pond from which the plaintiff's mill was supplied. The defendant, in widening this avenue, took in the space occupied by this dam, and, of necessity, removed it. At this point, over the stream, a bridge was built in the avenue, and connected with the piers of this bridge, the defendant built a semi-circular dam, to take the place of the one destroyed. This new dam was outside of the limits of the avenue, and was upon land that was not owned by the plaintiff but by a third party. This substituted dam, after serving its purpose for some time, gave way, in consequence, as the evidence showed, of defective workmanship in its construction. By the carrying away of this structure the mill of the plaintiff was deprived, for several weeks, of its supply of water, and stood still; and it was for the loss thus occasioned that this suit was brought. These facts being developed at the trial, the presiding judge ordered a non-suit to be entered, and this present review is sought in order to test the legality of that ruling.

In his argument here, the counsel of the plaintiff insists that this action is sustainable on one of two grounds. He urges, first, that the negligence of the defendant in the putting up of the dam erected by it, lays a legal basis for this suit.

But there is a plain fallacy in this contention. It is perfectly obvious that the defendant did not owe any duty, with respect to this dam, to the plaintiff; it was under no obligation to put it up, nor had it any authority so to do ; the doing of the thing was simply *ultra vires*. I do not see how there can be any doubt whatever upon this subject, for the charter creating the defendant prescribes precisely what ought to have been done upon the taking down of the dam of the plaintiff. The fifth section of the supplement of the act approved Feb-

ruary 16th, 1870, declares that "the owners of that part of the lands over which said avenues are authorized to be laid, which is not already lawfully in public use, shall be entitled to compensation for the use thereof hereby authorized, and the owners of every building or part thereof, or other improvement which it shall be necessary to remove, take down or destroy, shall be entitled to compensation for such building or part thereof so to be removed, taken down or destroyed." Then follow provisions for the ascertainment of the damages thus to be compensated. Therefore, the proper and only course to have been taken in this exigency was, to have the damages occasioned to the plaintiff by the removal of the dam and the appropriation of the land upon which it stood to the public use, ascertained and paid for in the mode prescribed. The defendant had no shadow of authority to substitute, in lieu of payment, the erection of a new dam in the place of the one demolished. If the mill of the plaintiff instead of the dam had been embraced within the bounds of the avenue, and the necessity for its destruction had thus arisen, it would never have occurred to any one that it was competent for the defendant to re-construct it on a new site; and yet such act would have manifestly been just as lawful as that act which, in the course of this transaction, was done. It is not pretended that there is any express power conferred upon this board, by its charter, to build this structure, and the only suggestion made by counsel, of a power by implication, is, that the dam may be regarded as a breakwater, or appurtenance to the bridge erected in the avenue. But this suggestion does not seem to me even specious. The dam is not of any service to the bridge or road, nor was it designed for any such purpose. Its entire removal would be an advantage to the public, as the stream would then flow, as it would seem, through the culvert under the bridge, without impediment, in its natural course. Nor would the act in question be legalized by the circumstance, if such circumstance existed, that it was done as a breakwater for the protection of the bridge, the reason being, that still the putting up of such structure

would be *ultra vires*. The defendant is not empowered to perform any act outside of the bounds of the avenue. No ability is conferred to acquire land for such a purpose, and the dam in question is upon land in which the public have no right whatever, so that its existence is a continuing wrong. It is altogether impossible to hold, upon legal principles, that the defendant owed it, as a duty to the plaintiff, to keep securely up an erection, the entire existence of which, from first to last, was and is a tort.

No rule of law is better seated, in theory and in decision, than the proposition that a public corporation cannot be liable to an action for negligence in the performance of any act which it has not the authority to do. Any other doctrine would be fraught with much public inconvenience; it would remove, in a great degree, the circumscription on corporate power which springs from the rule that no power exists, except such as is conferred by the charter, and it would obliterate, almost entirely, the salutary principle that an act which is beyond the corporate competency is, for all purposes, null. And it is likewise, from these same considerations, that the doctrine of estoppel, which is invoked in the brief of the counsel of the plaintiff, cannot be applied to such a state of affairs as is here presented ; though it may be remarked, in regard to the position so taken, that it is not perceived how the doctrine of estoppel is to be brought into the case, inasmuch as the plaintiff has not changed his position, nor waived any right in consequence of the line of action pursued by the defendant.

The principle just stated, that in order to make a neglect of a public corporation actionable, there must be a duty due from it to the person suing, is exhibited in the case of *Mayor of Albany* v. *Cunliff*, 2 *Comst.* 165, in a point of view that renders it peculiarly illustrative in the consideration of the present subject. The suit was for damages inflicted by the falling of a public bridge, which had been put up by the defendant by virtue of an act of the legislature, which it was decided was unconstitutional; the act of the defendant, there-

fore, in building this structure, was not warranted by any law. It was a pure case of *ultra vires*, and on this ground it was decided that the action would not lie, in the leading opinion read, it being said, "the rule seems to be well settled, that to charge a person in an action on the case for negligence in the performance of any public work, whereby any person has sustained any special damage, the law must have imposed a duty on him so as to make that neglect culpable." This authority, in principle, is plainly in point; in that case, the building of the bridge, and in this, the building of the dam, was wholly without any authority, and, consequently, the duty of carefulness in doing the work did not arise, in either instance, in favor of any one. A similar view prevailed in *Anthony* v. *Adams*, 1 *Metc.* 284. In that case, the plaintiff being damnified in consequence of an embankment put up by the defendant turning the water of a stream upon his land ; but a recovery was denied, the court being of opinion that the putting up of such embankment was wholly unauthorized. The principle of deciding in this case was the same as in the previous one just cited, that an incorporated town will not be liable for the consequences of acts that are not within the scope of the corporate powers.

But it is not necessary to particularize further in referring to the decisions, for they will be found collected in *Dillon on Mun. Corp.*, § 766, and where, with his usual accuracy, the author states the settled rule of law upon the subject, as deduced from the authorities.

It has been said that there is a second or alternative ground on which the right to maintain this suit can be placed, which is, that on the concession that the erection of the new dam was unauthorized, and is valueless to afford a right to redress, still the taking down of the old dam, without compensation being first given to the plaintiff, was a tort, for the commission of which the present remedy exists.

But this contention must also fail. There is nothing in the charter of the defendant that requires pre-payment of compensation before the taking down of this dam by the de-

fendant; on the contrary, the thirteenth section of the charter, being the act of the 31st of March, 1869, recognizes the right to take possession of the property sought to be condemned, previously to the ascertainment of the damages.    Nor is there anything unconstitutional in such a course of proceedings. There is a marked distinction between the procedure prescribed by the constitution of this state, for taking the property of the citizen by the state for its uses, and that provided when, for such use, it is taken by a private incorporation. The former case is provided for in *pl.* 16 of Article I., its language being, " private property shall not be taken for public use, without just compensation ; " and the latter is regulated by *pl.* 9, Section 7 of Article IV., in these words, viz.: " Individuals or private corporations shall not be authorized to take private property for public use, without just compensation first made to the owners." This difference in the terms used, appears to be founded on and to recognize the distinction which has been repeatedly adjudged to exist between the case of the state, acting for itself in the exercise of its eminent domain, and when such prerogative is delegated to be enforced by a private hand.    Judge Cooley states the law in these words : " When the property is taken directly by the state, or by any municipal corporation by state authority, it has been repeatedly held not to be essential to the validity of a law for the exercise of the right of eminent domain, that it should provide for making compensation before the actual appropriation. It is sufficient, if provision is made by the law by which the party can obtain compensation, and that an impartial tribunal is provided for assessing it." This was the construction of the constitutional regulation in question, by the Supreme Court of this state in *Loweree* v. *Newark, 9 Vroom* 151, and, in my opinion, such construction was manifestly correct.    The defendant, therefore, did nothing tortious in taking possession of and removing the dam in question, at the time and in the mode in which that act was done.    And it is obvious that the subsequent failure on the part of the defendant to have commissioners appointed, and the plaintiff's compensation ascer-

tained, cannot convert such lawful act into a trespass, for, since the Six Carpenters' case, it has never been doubted that a mere nonfeasance will not make a person a trespasser *ab initio.* Besides, in this case, the plaintiff stood by and acquiesced in the taking down of his dam, and accepted in lieu of it, for the time being at least, the structure unlawfully erected by the defendant; and it is, therefore, too late for him to take the ground that on that occasion there was a hostile invasion of his property.

From these considerations, I have concluded that this action cannot rest upon either of the grounds assigned in the argument.

The view thus taken assumes that the building of the dam in question was without any lawful authority, and that the taking down of the old dam was a justifiable act; the consequence is, that the question so much debated in the arguments of counsel, whether this defendant, being a public agent, could be held liable for a damage arising to the plaintiff by its negligence in the performance of its duty, is entirely eliminated from the discussion.

In conclusion, I may add that it does not seem to me that the plaintiff will incur any substantial loss by reason of this adverse decision. I cannot but think that a judgment in his favor would be utterly inefficacious. Out of what property could it be levied, or by what process could it be enforced? This road board has no power to raise funds to meet such a demand; its authority in this respect is definite, and limited to designated purposes. The needed moneys are to be assessed, in part, upon lands benefited, and, in part, upon the county; and it is obvious that the defendant could neither be ordered or permitted to levy a tax, which, of necessity, would disturb this adjustment, for the purpose of paying off a claim of this nature. Nor is the plaintiff without a reasonable means of redress. He can compel by *mandamus,* if necessary, an assessment of the compensation for the appropriation of his property to the public use, and it is not entirely clear that he may not even insist on having included in such estimate the

damages now sued for. But if the particular damages now claimed should not be recovered in the method indicated, he will have sustained a loss in consequence of his own neglect in not ascertaining, at the time of the condemnation of his property, what were his own rights, and what the lawful power of the defendant. *Vigilantibus non dormientibus leges subveniunt.*

The judgment should be affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, DIXON, REED, SCUDDER, VAN SYCKEL, WOODHULL, DODD, LILLY. 9.

*For reversal*—None.